Ms. Hunter. Thank you, Your Honor. May it please the Court, my name is Kim Hunter. I'm going to be representing the plaintiffs Clean Air Carolina, the North Carolina Wildlife Federation and the Yadkin Riverkeeper. And with me at counsel table I have Ramona McGee and Leslie Griffith. And this Court reviews this matter de novo. In their single-minded determination to construct the Monroe Bypass at a cost of over $800 million, the defendants disregarded this Court's admonition in 2012 about the importance of accurate baseline data. In addition, the defendants further compounded their violations of NEPA by ignoring dramatically changed circumstances in the project area, including significantly increased travel speeds, declining population, and the cries from local communities to look at less alternatives. Defendants here committed four independent violations of NEPA. They failed to analyze reasonable alternatives, they relied on inaccurate baselines and arbitrary assumptions to analyze both alternatives and impacts, and they denied the public the opportunity to review important information at a meaningful time. This Court has made clear that the National Environmental Policy Act, NEPA, is not only the nation's bedrock environmental law, but is an essential tool for democratic decision-making. NEPA does not require the selection of any particular alternative, but it does require an objective and thorough process to be followed and should not be used just to justify decisions that have already been made. NEPA's defendants first undercut NEPA's important role when they ignored key data and disregarded everything that had been going on in the project area for the past five years and therefore failed to analyze a reasonable range of alternatives, which is the heart of NEPA. What do you think the state's biggest flaw is? What's their biggest mistake? The biggest mistake was failing to analyze alternatives. This is central to NEPA. This is the whole purpose of NEPA, is to require the government to think about what it's doing and then also to allow the public- You don't think they've thought about what they're doing? In terms of whether they should build the bypass or whether they should look at alternative solutions, there's certainly no evidence in the record that at this time- What in your judgment was the most viable alternative? Local communities and an expert transportation planner that's worked for defendants and that we hired all got together and looked at what might make sense in the study area right now given that the need is much diminished. What they came up with was a combination of different fixes. It was improving parallel roadways, adding some additional turn lanes, better timing up of stoplights- Has that already been tried? No, Your Honor. Some very small scale fixes have been tried. About 45 very minor, less than $100,000 type improvements have been tried and have been tremendously successful. What we have suggested, at least asked to be considered, was much more major, much more change realignments that would cost much less than $800 million, but more like I think the super street intersections are about $6 million. Then upgrading these parallel roadways like old Monroe Road, Seacrest Shortcut. We worked with the local community to say, what do you need? A lot of this traffic along this corridor is local traffic. We looked at what's going to be helpful for your commutes, what's going to keep traffic off of US-74. These would be targeted alternative solutions that could be combined to solve the problem in the corridor, which is much less than it was when we first brought this case in 2012. Unfortunately, the defendants just simply didn't look at those alternatives. They say that they did in their briefs. I thought they said that they put in additional lanes and turning lanes and parallel lanes and that they had basically done what they could to eliminate unnecessary stoplights and the rest. Yes. Again, the very low-hanging fruit have been put in place and have moved the corridor from 20 miles per hour to 44 miles per hour. These more major improvements like upgrading Seacrest Shortcut or old Monroe Road or these new interchange improvements in Indian Trail, none of those have yet been implemented. Those are exactly the types of things that should have been looked at here and not. We'll ask the state about it. If the state had considered these alternatives in a way that you were satisfied with and still reached the same result, would you still have a problem with the road? NEPA requires the defendants to look at these alternatives. I ask you the question, had they done that? It's sort of a hypothetical. Had they done that and they looked at the alternatives the way you wanted to look at it, but they still decided to build the road, would you be satisfied then? Under NEPA, that's all they're required to do. Under the Clean Water Act, there is a separate requirement that they construct the least environmentally damaging alternative, but under NEPA, that's certainly all they're required to do. So if they had done that, then you would not be opposing the road or you would be opposing it under Clean Water? I think that would be a decision for my clients, but certainly that is the biggest issue that I know my clients have had and the community has had is that these alternatives haven't even been given a chance. I think the agency would say that the alternatives were essentially Band-Aids and sort of frittering around the edges and weren't going to address the underlying problem in anything more than a very temporary way, and what would you say in response to that? That's certainly what the agencies did say, and in their initial analysis in 2010, they looked at some of these solutions that have been implemented, and at that time they said these are Band-Aids, they're only going to get this road to 30 miles per hour. Well, the road today is 44 miles per hour as a result of just some of those so-called Band-Aids, so certainly I don't think their review of that was correct, and we're not being incorrect at that time. All we're saying is you need to learn from your mistakes, and now that those very small things have been effective, we need to look at what additional things can we do, maybe more major things, to solve this corridor. And again, all that NEPA requires is that those be given a hard look, but a hard look based on reality, based on what is the current traffic today, what are the speeds today, what is the population growth today, and defendants, again, go back and back and rely on their old traffic forecasts from 2007. Tell us how they've changed that in response to new conditions. It seems to me your real problem here is, as you forthrightly said in response to one of my colleagues, this is all about procedure. This is all about doing it. They've said they've done the procedure. You've been up here once. You've got to remand. And I guess, you know, we are supposed to defer to the agency. You know that. Your review is extraordinarily deferential. So what I think to me is missing, I understand you say there hasn't been enough procedure, that they haven't given enough reasons, that they haven't considered it enough. But what is your fundamental problem with the road? I thought it was cost. But you were just telling us now that your alternatives are going to cost a whole lot of money, too. Oh, no. Nothing compared to $800 million. But you said it was $600 million. No, no. $16 million. I apologize. $6 million. $6 million are the end-users. So is it cost that you object to? Cost is certainly a factor. But no, the environmental impact is, you know, certainly my clients are environmental nonprofit organizations. But then I was surprised at your response to my colleague when you said you weren't sure that you would be making any Water Act claim. That, in other words, if this claim fails, that you're not sure there are Clean Water Act. Or I don't know what you said, but maybe you can characterize what you said more truthfully. I certainly didn't mean to characterize it in that way. What I said was, is under NEPA, all the defendants are required to do is consider the alternatives. Is the NEPA claim the only claim we have in front of us? Yes. Okay. But to answer the first part of your question about whether defendants have re-looked at these alternatives and done that process. I don't think we can just say they haven't re-looked at it because you don't think they have. No. No. And that's not what I want to say, is that they're still relying on the exact same traffic forecast that they brought in front of you in 2012. Those have not changed. It's the identical data. They haven't updated anything in light of the new conditions. The purpose of the remand was to factor into their assessment the actual growth that would be stimulated by the bypass itself. And that seemed to me the thrust of the remand. The question then is how did the agencies factor in bypass-induced growth? They hadn't really considered that. Now the agencies come back and they say, all right, this time we did consider bypass-induced growth. We identified the areas most likely to see induced growth. The areas with the most capacity for growth. The areas with the most improved access due to the bypass. And so they said they got much more specific on remand in considering bypass-induced growth area by area. And then they said at the end of that, their analysis projected about 1% more land use for residential development than under the no-build projection. And so why? I was under the impression that it was less about the remand may have been less about considering this alternative and this alternative as opposed to factoring in bypass-induced growth into their entire analysis. Am I wrong about that? No, that's exactly right, Your Honor. And the alternatives claim is a separate claim that we have brought in light of the changed conditions. But shouldn't that have been brought earlier? It was brought. But it wasn't the focus of this court's decision. But it was brought the first time around. Of course, things have changed since that first lawsuit was brought. All the traffic and the population forecasts have changed. But to answer your question about the induced growth, I believe what you're referring to is defendant's build analysis. Our concern has always been with the no-build. And without an accurate no-build, you can't have an accurate build. And our concern with the build, now that we've got the explanation that you asked for in 2012— Is it a question of alternatives now? Is that water over the dam since that wasn't the focus of the remand in the earlier appeal? No, Your Honor, because two months after this court remanded, the Federal Highway Administration rescinded the record of decision for this project. And they restarted the NEPA analysis and said that they were going to a fresh look at alternatives. And so those claims restarted. They didn't simply address this court's specific issues on remand. Moreover, this court specifically said it wasn't ruling on those issues and that the agency would have a chance to look at those things again when it made the explanation that was asked for. But again, with the no-build scenario, our concern is that defendants now they've explained what they've done. What they have said is, well, our no-build scenario essentially doesn't account for the impact of infrastructure. And that's why it doesn't matter whether or not this bypass was included in our no-build scenario. Can you fathom any way the state could do everything you wanted them to do as far as consideration and the state reached the conclusion to still build this road to which end analysis and a decision you would not object? Is there any process they could follow and get to the result of building the road that you wouldn't object to? We might object, but we wouldn't have legal claims if they... Well, they might say that now, but I'm just asking. If they presented an accurate no-build baseline that took account of congestion and if they looked at alternatives... Wait, wait, wait. I want to get your answer straight now. I don't want to leave you room to move. My question, I'm just saying, what if they looked at everything that you thought was appropriate? They looked at all those factors. They just looked at them differently than you did. Everybody agreed on the same data, and they decided after all that process under NEPA they were going to build the road. That would be satisfactory to your clients then to have the road built under that condition? There'd certainly be no legal claims under NEPA. I didn't ask you that. I said it would still be satisfactory to your clients to have that road built. No, no, they wouldn't be happy. There'd still be environmental impacts, but we wouldn't have legal claims. Thank you, Ms. Hunter, and you've also reserved some time for rebuttal, so we'll hear from you again. Ms. Kranz, it'll be a pleasure to hear from you. Good morning. My name's Erica Kranz. I'm representing the federal parties in this case, but with me at council's table also is Tom Griffin and Scott Slesser, who are representing the state. So Mr. Griffin will speak for five minutes after me. I think you've really honed in on the fact that NEPA is a procedural statute and that  comply with NEPA. We have now a 400,000-page record developed, both before and after remand, and as you identified, that remand was quite narrow. I mean, the agencies were directed— Yeah, but as I remember the opinion, it particularly reserved these issues. It only remanded because they had used the build-in, the no-build model, which seemed extraordinary, even though you or your predecessor came up here and said that was perfectly all right. We did remand. So on remand, the agencies took specifically a close look at that particular issue, since that's what this court identified, but they also did a lot of other work. They gathered new information about how traffic is flowing today. They assured themselves that the no-build population forecast truly was a no-build, and then they devised this separate process to create a build forecast to study effects. What about the study of alternatives, what Ms. Hunter was focusing on? Sure. Well, one thing I think that's gotten a little bit lost here, because we're all really focused on this 50-mile-per-hour speed, is that there are a number of parts to the purpose and need for this project. For an alternative to be a viable alternative, it has to meet all of those parts. One is mobility, increasing capacity. There is the high-speed 50-mile-per-hour corridor, and then the corridor needs to align with the vision of the North Carolina Strategic Highway Corridors Program, which specifically envisions a freeway-style facility. If you look back at the agency's initial analysis, you'll see that a lot of those alternatives were screened out not just because they don't meet this 50-mile-per-hour standard that's been established, but also because they wouldn't provide adequate capacity over time, or they wouldn't provide this freeway-style facility. I'm sorry? Freeway-style capacity. The Strategic Highway Corridors Program envisions a controlled-access-style facility. Think about a freeway with on-ramps. On-ramps are controlled-access. On-road going into another road, you can't go through someone's house instead. Right. On-ramps. You mean like an interstate. Sure, right. This is essentially within one county, but right. That's what you meant by that. Yes, so, you know. You mean interstate. Yeah, an interstate-style road, exactly. Why was that preferable? Well, it's part of the policy vision for this project, and it was part of the defined- I understand you saying that, but what is the vision? Why is- It may be a good question for the state, but- You don't know. Okay. The, you know, having this controlled-access, limited intersections. The current U.S. 74 has 29 intersections. I thought the whole deal for doing those kinds of roads was that the traffic went faster. Yes, the traffic- Back to the point that these Band-Aid things have made traffic go much faster than you all ever predicted. Traffic is moving faster than it was predicted, and than it was previously, due to the improvements that North Carolina has undertaken. But the crucial fact is that the U.S. 74 is still not moving adequately. It's not meeting the purpose and need of this project now, and there is no question- What reason is there to believe that the present trends won't continue, that the speed limits will be further increased, and that if the preliminary- if the relatively minor steps that you've already taken have helped to increase traffic flow, why not take some further steps along those lines? Because once you build a bypass, it's irrevocable. Whatever streams and forests and fields and other things are destroyed, you can't get them back. Well, North Carolina is planning to do some other improvements. For instance, it is planning to implement some super streets along U.S. 74. When we get down to available alternatives, can that be decided under NEPA with simply speculating whether the available alternatives will or will not work, or does it require that you make some effort to actually try the alternatives when there's some reason to believe that they might produce beneficial results? The agencies don't believe there's any reason to believe that these alternatives plaintiffs are talking about will produce- You said there's no reason, but over the past five years, the flow of traffic has improved. So why isn't- I mean, not just improved, but improved significantly. So why isn't that- But it has still not improved to the point that it's meeting- The point is your prior prediction was wrong. So why is this prediction correct? The fact that the prior predictions were based on traffic simulations, and the agencies- Plaintiffs are saying that we're still relying on these previous simulations. That's not correct. What the agencies are relying on now is the real-time traffic flow data that was gathered on remand, and that information shows that 74 is not moving adequately. The agencies have studied these other alternatives that plaintiffs are talking about, and the fact that conditions have improved doesn't mean suddenly that these other alternatives are going to be able to- Let's just be sure we understand what we're asking you. What I remember from the first time you were up here, that nothing was going to make the difference except this road. There wasn't- This was going to be terrible traffic. There was not going to be any change. So we didn't let you do the road. So you go back and you make these various band-aid changes, and things have improved. They aren't quite where you want them to be, but they're pretty close. So that's why I'm asking you, and I think Judge Wilkinson was asking you, what's different now? Well, what's different now is the agencies have gone back and asked themselves, can these other things- How did you do that the first time? You represented to us that you'd done it the first time, but you were wrong. Well, the fact that traffic models haven't played out precisely in reality doesn't mean that entire analysis should be abandoned. DC Circuit and EME Homer City told us exactly that. The fact that models have turned out to not be precise in reality doesn't mean we completely abandon them. You know, so I would direct you- And the goal is to get to 50 miles an hour during rush hour, is that right? Yes, but also- I think you people should come to Maryland. We have got a lot of issues there. I live in Maryland. I know all about it. We were surprised you showed up on time. I came last night and I took the train. I want to direct you for alternatives to some responses that the agencies have in the record that are addressing these concerns that the plaintiffs have been raising over time. In particular, the, sorry, Joint Appendix 4519 through 25 and 4631 through 36. The agencies have done a lot of work here. The fact is that they didn't have to address this alternatives analysis on remand, but they knew we would probably be back here. And they made sure that they were able to gather the data they thought they needed. And again, these are agencies with substantial transportation expertise. This is what they do and- What they say. What point do you want to make? The point I want to make is that the agencies don't need to do additional analysis that's not going to help them make an informed decision. So, we have to be able to draw the line somewhere. And the agencies, respectfully, have plenty of information to know that they can draw that line. The other side said in response to my question, what's your biggest concern? And I think they said you didn't consider alternatives. Did you consider alternatives? Absolutely. Just summarize how you did that for us. The agencies gathered new data, confirmed the need for the project today, whether there's going to be, you know, the precise amount of growth that's going to occur is apparently in dispute. But the amount of growth isn't important. The fact is there's going to be growth. Everyone agrees there's going to be growth. Traffic's going to be worse because of it. And the agencies- You're just making comments about facts. I asked you how did they consider alternatives? They gathered- You're making some argument about growth is going to occur. Well, maybe that's true, but I didn't ask you that. They gathered new data and they went back, looked at their original alternatives analysis, and confirmed that the alternatives that they considered and new alternatives that plaintiffs have raised would not satisfy each element of the project's purpose and need. What you're worried about here is a preconceived mindset and that, you know, this bypass is going to be built and that the preconceived mindset is sufficiently locked in that it doesn't adjust to actual changes in the facts on the ground. And you don't dispute that there's been a substantial easing of congestion over the past five to ten years. That's right, but congestion still exists to justify the continued need for the project. And that's what's most important here. Can you give us your best case for a situation that's similar? Because Judge Wilkinson's question about her mindset is to me, I mean, the standard review is certainly in your favor, but it just seems to me real world, once somebody decides they're going to do it, they're going to do it. And maybe you have a situation similar to that where a court has remanded a case to you and you've on remand decided not to do it. Well, I don't know if it's quite that specific, but National Audubon Society, you know, tells us that the test for NEPA compliance is objective. It's not about subjective good faith. And again, I would submit the agencies did a lot of work on remand. They answered a multitude of questions from plaintiffs and other commenters. And that involved getting experts out in the field, making just... Absolutely, yes. I think we're trying to tease out what that is. For instance, plaintiffs submitted an expert report that was reviewed by both the state and federal agencies and three different engineering firms. So it's not as though this is just some groupthink within the agencies. They're reaching out to other people. They're talking to the communities, gathering information, and making the best decision that they can. I would like to address, since we've been talking... I'll give you some time to explain your view, but how long will it take to build this bypass? I believe construction's been underway for about a year now, and I think we have another three years. What kind of construction? The right-of-way has been cleared. They've been doing some work with culverts. Paving has not yet... What happens if you haven't complied with NEPA? I'm sorry? How does the construction get underway if there's been noncompliance with NEPA? Well, the plaintiffs sought an injunction pending appeal, which this court denied. So there's nothing preventing the project from being constructed right now. Would it take to bring the process, the bypass, to completion? So I believe it's scheduled for completion in 2018. So we have a couple more years. What we're talking about, four to five years? Three years total for construction. So that option is always open to you. I mean, where are the irrevocable effects going to be? I mean, the loss of farmland and environmentally pristine land, if it's lost to the bypass, it couldn't be reclaimed. But the bypass option is always open in the event that the trend lines that we've been talking about for the past five years are reversed. So I mean, you have to ask, I guess it's back to something resembling an irreparable harm standard when someone seeks injunctive relief. But where does the irreparable harm here lie? Well, I think that's a better question for plaintiffs. But again, they've sought a preliminary injunction. It was denied. So at this point, I mean, if you're inclined to rule against us, I think the appropriate thing to do would be to remand to the district court for discussion of appropriate remedy. Because of course, an injunction doesn't issue automatically. The district court has asked us not to ever send this back. It doesn't shock me. I'm teasing. I would like, I see that I'm out of time, but I would like to address a couple other points that plaintiff raised. Okay, so first, we've been talking about alternatives analysis a lot. I want to talk about effects for a moment. Because plaintiffs have said that the issue on remand was about the appropriateness of the no-bill growth projections. We have now done a study, removed the bypass, put the bypass back in, and verified that the bypass didn't have an effect on those no-bill projections. Now, when plaintiffs say that those projections were completely blind to transportation infrastructure, that's not correct. They simply didn't reflect a change based on this particular project. And that's why the agencies undertook this separate analysis to specifically model the induced growth that they expect the project to occur. You're really not suggesting that the first analysis was correct, are you? Yes. Because what we have now seen... Now, there you have four-circuit precedent flat against you, right? Well, what we've seen is that when you removed the bypass, yes, as it turned out, the bypass was... You're all about procedure, right? Yes. So what was the correct procedure to begin with? The correct procedure, not what the result was. Well, the correct procedure probably would have been to... What the agencies did on remand was to have done that before, right? So now the agencies have done it. We've verified that the no-bill... Are you sure you want to take this extra time? Is this counting against my co-counsel here? No, no, it may be counting against you. All right, I... You just made a statement that the panel made you back up on. Well, I want to make one important point about this. You may do it, but you need to be careful, I would suggest to you. The most important thing when you're talking about the growth effects, it's not so much where you start with the no-bill or where you end up with the bill, it's the difference between the two. And plaintiffs haven't said anything to suggest that the process used to model that difference was improper. That's what I'd like you to focus on. In terms of putting that new build growth projection back into the traffic analysis, agencies did a sensitivity test to see what the effects would be. They decided the effects were not large enough to require them to go back and do all this extra analysis. Again... How did you conclude that additional or better time traffic lights and better turning lanes? You've got a lot of civil engineers at your disposal, and you talk about the agency's expertise, but that expertise also exists in deciding whether traffic lights and turning lanes and different intersection configurations can do the job. And so how did you conclude that they could not do the job? The agencies have already implemented the vast majority of those types of improvements that we're talking about. And again, the quarter is not up to speed. So what was predicted before isn't as important as what we see on the ground today. No one's disputing that traffic is going to get worse. Well, it might be important if we look at the fact that your predictions before were wrong. So maybe your predictions now could be wrong. Well, especially... Might it matter there? The agencies... You've come before us to make representations in the past about what the future will be, and lo and behold, you're wrong. Not that you're bad people, you're just wrong. Does that really do a lot to create confidence in your projections forward? I totally understand the concern, but the agencies are no longer relying on those predictions about traffic. They're relying on the fact that the observed data today says this quarter isn't performing. Now, they have some projections about the incremental improvement that these targeted fixes can do, like super streets, and it's not going to be enough to improve the corridor as a whole. I think it's time for me to... Don't dispute the fact that traffic flow has improved not just marginally, but significantly. Traffic has improved due to these improvements that... Significantly. Yes, I'd say it's been significant, at least comparing the simulations from before to the real-time data now. We don't have real-time data from before. So, we're comparing apples and oranges a little bit. But that's sort of the one concrete thing we have, is that the actual conditions on the ground and on the road have improved. Have improved, but not enough to satisfy the purpose and need even today, not to mention the growth that's expected in the next 20 years, which is predicted to be a 50% growth by 2030. 50%, 5-0, or 48%, I think. So, we're talking about a lot of growth. There's no question that there are going to be a lot more people. There's going to be more traffic. Is there some end to your extra time and argument here? No, I would love to sit down. It's just fair the other side gets limited time at some point. Mr. Griffin. Good morning, Your Honors. My name is Tom Griffin, and I represent the State Defendants. Thank you for the effort. I'm going to start with a couple of things that we've done today. Your Honors have hit on all sorts of numbers and facts and figures in the record, and you've heard that the record is 400,000 pages long, but I have another number that I think is far more important. Actually, two numbers. One is 182, and one is 229.  that's before this court to respond to the comments from SCLC and their clients and their experts, all of which have been raised today and in the briefing, and all of them have been responded to in detail. Turn sideways, small font. I had to pull out my readers to read them. 229 separate comments, many of which are detailed. Those comments are a great place for the court to start because they answer your question. Judge Motz, they answer your question about the strategic highway corridor at JA 3301, I think. Judge Wilkinson, they talk about your concerns about the improvements today and what kind of changes they've made and how we look to the future. That's our obligation, to look to the future and see if the purpose and need will be met at the project design horizon, which now is 2035. Judge Jed, they talk about alternatives and looking at this particular alternative. I didn't say they didn't. I didn't suggest they didn't. I just asked the other side what their main argument was, and I thought that that's where your argument would go to, if that's their main point, but I'll leave that to you. Oh, yes, Your Honor. I think you put your finger right on it. This is really about the bypass or not. Bypass or 24. You want to address the alternatives, then. Yes, ma'am. I wanted to pick up where Judge Wilkinson left off, which is there have been lots of improvements. We acknowledge that. That first figure, if you read the DEIS, the 30 miles per hour, 47-minute travel time versus 70-minute travel time, those are not commute times. Those are modeled times for travel from point A to point B to determine the purpose and need for the project. We could tell in 2007 that by 2030, we'd be crawling along if you wanted to get from Wingett to Charlotte, right? That's what that was for. When we went back, we said, what's currently happening? If you read the DEIS, it says those initial projections were based on no improvements. If nothing was improved, now they've been improved. Let's go back. Let's look. We've done 45 improvements, a few more to go, and speeds have improved. That's what we predicted what would happen in the Stantec report. But the point is, we've actually looked, and if you look, there's a report that looks at NREX data at JA4400-01. We looked at the speeds over the last few years with while improvements were happening, and quarter speeds are not improving. We've looked at the alternatives that are suggested by plaintiffs. And actually, I wrote that number down, Your Honors, but I'm not sure that I can call it up real quickly. But it's in the comments by this Ole Monroe Road and those kind of things. We know now, right now, that we can't meet the requirements of the purpose and need. That's the measure, purpose and need. We know, right now, we can't do it. And we know, by the application of our scientific expertise, projecting into the future, that we will not meet the future need in the future. It's the purpose and need in the future. It's common sense. We did that using science. Yes, we have, as a base, the past traffic forecast, but we used current socioeconomic data from various years. If you use the best experts you could find and the expert just turned out to be wrong, but that expert used the best analysis that she had at her disposal, state-of-the-art programming, computer programming, used the best expert you had, you base the decision on that, hypothetical to you. Yes, sir. Would you violate NEPA? Well, sir, NEPA doesn't require perfection. We're looking in the future. I didn't ask you what it required. I said, would you violate NEPA? No, we would not, and not in the present, because NEPA doesn't require perfection. It requires us to look in the future and use our best judgment. It doesn't allow us to... We don't require to use a crystal ball, as the Supreme Court said. So what we did is we took data and we validated using expert analyses all the way through the 2014 socioeconomic data that our traffic forecasts are still reliable and our estimates of growth are still reliable. In the end, we have to do these things. We have to make an informed decision, take a hard look. We have to inform and involve the public, provide a springboard for public comment. We had multiple and updated analyses. We had expert scientific scrutiny. We had careful review. We looked at the exact questions this court posed, socioeconomic data at GA-2720. That's one thing. Growth factor, if we looked at this congestion idea, like I said, the 70 minutes in that report is not a commute time. And all of this was different than what you did the first time, right? It is updated. It is an updated thing. We could have gone... The first time, didn't you tell us the same thing? No, ma'am, we didn't. I didn't update it the first time. I know you weren't here, but it's your case. Yes, ma'am, it sure is. And we were current as of the time that we went through it. And you sent it back because we hadn't disclosed our data. What we could have done, I imagine, we could have just fixed that problem. We could have said, let's go address Judge Mott's question about the no-bill versus bill data. May I continue, Your Honor? I've got, I'm in 25, half a second. Let's wrap it up. Yes, so we could answer that question and go back. We rescinded the rod. We've gone back and studied the data from, that is current data, and made an informed, proper decision. This has been publicly debated. The public's been involved. Thank you, sir. We appreciate it. Thank you, Your Honors. Ms. Hunter, you reserve some time for rebuttal. We'd be happy to hear from you. Just a few quick points. First, to clarify and to confirm what Judge Mott's asked, the defendants are up here with the exact same traffic forecast that they brought. I think that, though, that your colleague is correct that they can be wrong as long as they've done the appropriate things. Wouldn't you agree? If they did the appropriate things, Your Honor, yes, they could. But Ms. Kranz said over and over again that they've gathered this new data. The new data they've gathered is this new data showing how improved the corridor is today. And what she says is, well, this confirmed the need for the project. And this is the mantra throughout their briefing. We've confirmed the need for the project. But that's not what NEPA is about. NEPA is about analyzing alternatives. And you might confirm that there's still a need. No one disputes that there's still a need. We're not at 50 miles per hour. But you need to look at what alternative solutions can meet that need. And that is the step that defendants didn't take. So having gathered this new data and seeing the new realities, defendants needed at least to stop and say, OK, in this new reality, is there something else we can do here? And that's what they didn't do. Ms. Kranz talked a little bit about this strategic highway corridor. They did to an extent. I mean, they did say, we've made these changes. And the changes that we've made are, as Ms. Kranz put it, the low-hanging fruit. They're the easy changes. And they say that they're really the only feasible changes. That we've done what could be done. That's their consideration of the alternatives. They say there just aren't that many improvements out there that are going to have any demonstrable effect on the congestion. Well, Your Honor, what defendants have actually done is the more comprehensive, larger-scale solutions that we in the community suggested, they set the only reference they give to why those don't work. Those 2007 traffic forecasts that have shown to be incorrect. So throughout their briefing, if you track it back time and time again, when they say we looked at these things, they looked at them in 2010 and 2009 based on data that has shown to be incorrect. And sure, it wasn't perhaps their fault at the time that they were projecting incorrectly. But now that they know that they were, they should have at least gone back and said, let's take a fresh look today based on what we know today. Could these alternatives make a difference? Let's present them to the public, have an informed democratic decision-making process. And then we can decide- NEPA doesn't always require a fresh look, does it? I mean, it doesn't require every time there's a court remand to go back to square one. No, but defendants purported to take that fresh look. And they presented to the public as if they had looked at those alternatives, but they did not. And this court had expressly reserved those issues on remand. Is there outrage locally that this bypass is being billed? There is. Most people just don't want that bypass. I couldn't say whether most or not, but certainly- I mean, I know your clients don't want it, but I'm just wondering if anything in the record indicate people just don't want it. There's a lot of public comment in the record, but also five municipalities in Union County actually switched positions from 2009 and passed in the past few years resolutions asking that alternative solutions be looked at now that they know that there's- That doesn't mean they won't- Oh, they expressly asked. How many counties are there? How many municipalities, do you mean? I believe there's- I thought you said counties, but- I'm sorry, municipalities in the county. I believe there's 12 or 14. And some are not really impacted by the bypass, of course, because it's a larger county. Some are closer to Charlotte. But it seems to me, from my experience generally, sort of what Judge Mott says, people don't really oppose having faster roads to get where they want to go. Well, people- They oppose 15 years downstream when you're going, I'm voting against the mayor or the governor because it'd taken me three hours to drive what ought to take 35 minutes. That seems to be the general hue and cry is, why wasn't somebody forward looking to put in another beltway or to do something to ease this? Well, Judge Shedd, I believe people don't like paying taxes also. And this is an $850 million road. And so what you'll see in this- If people have to pay taxes, I guarantee you, they wouldn't mind paying taxes for something they can actually use. Yes. Yes, Your Honor. And that's exactly- As opposed to paying taxes for stuff they can't use. And that's exactly what they've said in these resolutions is given how expensive these resources are and given the limited transportation resources in North Carolina- No, no, no. My point would be, then put it on the ballot. If you go spend taxes or you want roads or you don't want studies about other stuff we don't, what happens to germination of seeds in Antarctica? I mean- They want roads that work for them. They want roads that work for their community. And that's what these types of fixes would do. And under NEPA, the authorities have made that determination. You don't agree with it, but they've made that determination that it will work. You just challenge that. They've made the determination that the bypass will work, but they haven't said, would something else work? And that's what NEPA requires, and that's what they didn't do. And I believe I'm out of time. Thank you. I appreciate it. We will- Do you want to take a break? No. We'll come down and greet counsel and move into our second case. Thank you.
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Dennis W. Shedd